IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA18-1090

 Filed: 1 October 2019

Mecklenburg County, No. 16CRS200252

STATE OF NORTH CAROLINA

 v.

SHELTON ANDREA KIMBLE, Defendant.

 Appeal by defendant from judgment entered 16 March 2018 by Judge Andrew

Taube Heath in Mecklenburg County Superior Court. Heard in the Court of Appeals

6 August 2019.

 Attorney General Joshua H. Stein, by Assistant Attorney General, Marc X.
 Sneed, for the State.

 Glover & Petersen, P.A., by Ann B. Petersen and James R. Glover, for
 defendant-appellant.

 BERGER, Judge.

 On March 16, 2018, Shelton Andrea Kimble (“Defendant”) was convicted of

first-degree murder for killing Tyrone Burch (“Burch”). On appeal, Defendant

contends that the State violated his Fourteenth Amendment right to substantive due

process by failing to correct false testimony given by witness Sharon Martin

(“Martin”). We disagree.

 Factual and Procedural Background
 STATE V. KIMBLE

 Opinion of the Court

 On January 3, 2016, Defendant shot and killed Burch in the parking lot of a

dance club in Charlotte, North Carolina. Martin testified that earlier that night,

between 10:30 and 11:00 p.m., she arrived alone at the dance club and noticed

Defendant was sitting at the bar. Martin bought Defendant a drink and the two went

to the dance floor and continued to talk. Subsequently, Burch arrived at the dance

club and met Martin near the dance floor. Martin testified that Burch was her

boyfriend at the time of the shooting and that she had previously dated Defendant

for eight years.

 Martin and Burch left to talk outside. Afterward, Defendant walked outside,

and as he passed Martin and Burch, he said something, which prompted Burch to

punch Defendant in the face. The two then fought for approximately 30-45 seconds.

A bouncer and a patron of the dance club broke up the fight.

 The facts are disputed as to the exact circumstances that followed, but on

appeal both parties concede that Defendant fired a gun multiple times at Burch

causing fatal injuries. The bouncer testified that he observed Defendant go to his

vehicle and subsequently fire a gun at Burch while Defendant chased after him.

Martin testified that she saw Defendant open the driver’s side door of his vehicle and

that Defendant typically kept his gun in a pocket on the driver’s side door. After

firing his gun, Defendant ran to his vehicle, dropping his gun in the process, and

 -2-
 STATE V. KIMBLE

 Opinion of the Court

drove home. Later that same night, Defendant turned himself in to authorities, and

he was charged with murdering Burch.

 An autopsy of Burch’s body showed multiple injuries consistent with gunshot

wounds. One of the gunshot wounds was to the top back right side of his head, and

the projectile traveled “almost straight down” through his head and lodged near the

brain stem on the right side A second gunshot wound was to the right side of his

neck, which had a similar trajectory as the projectile that entered near the top of

Burch’s head. This second projectile exited through the chest. Another gunshot

wound was under his right underarm, and the projectile exited near his back

shoulder. A fourth projectile entered near Burch’s back left shoulder blade and lodged

in his chest. The fifth projectile entered the back of his left thigh and exited through

the front of the same thigh. A firearms and toolmark expert testified that the five

projectiles recovered from the scene and from Burch’s body were fired from the same

firearm.

 Prior to trial, Martin met with prosecutors to prepare for her testimony.

During the meeting, Martin was given the 35-page statement she had made to

detectives on the day of the incident. Martin read the statement and informed the

prosecutors that it reflected what had taken place on the night of the incident. In her

statement, Martin told detectives that she did not see the shooting, but that she saw

Defendant “holding a gun” and “running” towards Burch. After the meeting,

 -3-
 STATE V. KIMBLE

 Opinion of the Court

prosecutors provided defense counsel a page and a half of notes that they had taken

from the meeting with Martin.

 However, at trial Martin testified that she saw Defendant shoot Burch, saw

Burch fall to the ground, and saw Defendant stand over Burch and shoot him. When

challenged about her failure to tell anyone about witnessing the shooting, Martin

testified that she had told a prosecutor those same details during a pre-trial meeting.

 Outside the presence of the jury, the State informed the trial court and defense

counsel that during their pre-trial meeting, Martin had never told them that she had

witnessed Defendant stand over Burch and shoot him. Defense counsel requested, in

an attempt to correct any false evidence from Martin’s testimony, that the State make

a statement to the jury explaining that Martin had not informed the State that she

had in fact witnessed Defendant stand over Burch and shoot him. The State replied

that had they received new information, they would have turned it over to defense

counsel in compliance with discovery rules and that any misunderstandings could be

cured by cross-examination.

 The trial court did not require the State to enter into any stipulation or make

a statement to the jury. It reasoned that this was not a statutory violation, but rather

a “discrepancy between what the witness believes she told the State and what the

State has recorded in their notes.” The trial court then provided defense counsel the

opportunity to further cross-examine Martin, which it declined to do.

 -4-
 STATE V. KIMBLE

 Opinion of the Court

 The jury found Defendant guilty of first-degree murder, and he was sentenced

to life in prison. Defendant appeals, arguing that he was denied due process by the

State’s failure to correct Martin’s false testimony. We disagree.

 Analysis

 It is established that a conviction obtained through
 use of false evidence, known to be such by representatives
 of the State, must fall under the Fourteenth Amendment.
 The same result obtains when the State, although not
 soliciting false evidence, allows it to go uncorrected when it
 appears. Further, with regard to the knowing use of
 perjured testimony, the Supreme Court has established a
 standard of materiality under which the knowing use of
 perjured testimony requires a conviction to be set aside if
 there is any reasonable likelihood that the false testimony
 could have affected the judgment of the jury. Thus, when
 a defendant shows that testimony was in fact false,
 material, and knowingly and intentionally used by the
 State to obtain his conviction, he is entitled to a new trial.

State v. Murrell, 362 N.C. 375, 403, 665 S.E.2d 61, 80 (2008) (citation, quotation

marks, and brackets omitted).

 “Evidence that affects the jury’s ability to assess a witness’ credibility may be

material.” State v. Wilkerson, 363 N.C. 382, 403, 683 S.E.2d 174, 187 (2009) (citation

omitted). “To establish materiality, a defendant must show a reasonable likelihood

that the false testimony could have affected the judgment of the jury.” State v.

Phillips, 365 N.C. 103, 126, 711 S.E.2d 122, 140 (2011) (internal citation and

quotation marks omitted). However, to the extent that a witness’s testimony may

have led jurors mistakenly to believe false evidence against the defendant,

 -5-
 STATE V. KIMBLE

 Opinion of the Court

subsequent admissions during cross-examination may correct any

misunderstandings elicited and allow the jury to assess a witness’s credibility. See

Wilkerson, 363 N.C. at 404-05, 683 S.E.2d at 188 (determining that “the State did not

obtain defendant’s conviction through the use of false testimony, nor did the State

permit false testimony to go uncorrected” because “[t]o the extent that Mrs. Davis’

testimony may have led jurors mistakenly to believe that she could not receive a

benefit from her testimony against defendant, any misunderstanding was corrected

by her subsequent admission during cross-examination that she hoped her sentence

would be further reduced.”).

 In State v. Phillips, the defendant asserted that the witness’s trial testimony

was false and material because “it contradicted the notes made of her pretrial

statements and that the State benefited in both the guilt-innocence and penalty

portions of the trial.” 365 N.C. at 126, 711 S.E.2d at 140. Our Supreme Court

disagreed with the defendant’s argument and reasoned as follows:

 Although Cooke’s trial testimony is inconsistent with the
 notes taken by others during her pretrial interviews, the
 record does not establish whether Cooke’s direct testimony
 was inaccurate, whether her pretrial interview statements
 were inaccurate, whether the notes of those interviews
 were inaccurate, or whether Cooke’s recollection changed.
 At any rate, it is not apparent that Cooke testified falsely
 at trial or that her trial testimony conflicted in any
 material way with her pretrial statements. Moreover, any
 inconsistency was addressed in the presence of the jury by
 Cooke’s subsequent cross-examination when she made the
 following pertinent clarification:

 -6-
 STATE V. KIMBLE

 Opinion of the Court

 [Defense Counsel:] You testified that you do not
 recall [defendant] saying anything about I have
 nothing left to live for?

 [Cooke:] Not on those terms, no.

 [Defense Counsel:] Do you remember telling
 [Investigator] Kimbrell in this year that
 [defendant’s] brother had been shot and he had
 nothing left to live for?

 [Cooke:] I don’t think that I put it quite that way,
 but I might have, but that is not the way that
 [defendant] actually, you know, said it.

Id. at 126-27, 711 S.E.2d at 140.

 In the present case, Martin testified on direct-examination that she saw

Defendant stand over Burch and shoot him. On cross-examination, defense counsel

used Martin’s 35-page statement to refresh Martin’s memory and to impeach her.

The following exchange then occurred:

 [Defense Counsel:] Okay. Now, you did not see the
 shooting, did you?

 [Martin:] I seen him running with the gun shooting it.

 [Defense Counsel:] Now, but didn’t you tell the police a few
 hours after this happened back on January 3rd, 2016, you
 did not see the shooting?

 [Martin:] That was incorrect.

 [Defense Counsel:] Okay. So what you told them after the
 – excuse me. What you told them on January 3rd right after
 everything happened, you’re saying that part wasn’t right?

 -7-
 STATE V. KIMBLE

 Opinion of the Court

[Martin:] I seen Mr. Kimble running with the gun
(gesturing) shooting. That’s what I seen.

[Defense Counsel:] And my question to you was: Do you
recall telling the police on January 3rd you did not see the
shooting?

[Martin:] I don’t remember. I was traumatized after all of
this. So what I said then, I don’t remember.

[Defense Counsel:] Permission to approach the witness,
Your Honor?

THE COURT: Granted.

[Defense Counsel:] All right. Ms. Martin, I’m showing you
once again your 35-page statement that you gave the
police. When you get a moment, please look over page 15,
page 20, page 24, and page 25. Let me know when you
finish. . . .

[Defense Counsel:] Now, Ms. Martin, now that you’ve had
an opportunity to look over pages 15, 20, 24 and 25, does
that refresh your memory as to what you told the police
about whether or not you saw the shooting?

[Martin:] Yes.

[Defense Counsel:] Okay. And isn’t it true, you told the
police you did not see the shooting?

[Martin:] Yes.

[Defense Counsel:] Now, Ms. Martin, since January 3rd of
2016, have you had any interaction with the Burch family?

[Martin:] No.

 -8-
 STATE V. KIMBLE

 Opinion of the Court

 [Defense Counsel:] Now, on direct, you testified that you
 saw Mr. Kimble walk up and shoot Mr. Burch while he was
 on the ground. Isn’t that what you said?

 [Martin:] Yes.

 [Defense Counsel:] But do you recall when you spoke to the
 police on January 3rd, 2016, they asked you that exact
 same question, didn’t they?

 [Martin:] Yes.

 [Defense Counsel:] They said, did you see him walk up and
 shoot Mr. Burch on the ground? They asked you that;
 right?

 [Martin:] Yes.

 [Defense Counsel:] You said no, I didn’t see that.

 [Martin:] Yes.

 On re-direct of Martin, the State clarified that when Martin met with

prosecutors two weeks prior to trial, she told them that the written statement was an

accurate reflection of what happened.

 [The State:] Can you just flip through [the statement] and
 make sure it’s complete, please?

 [Martin:] (Complies.)

 [The State:] Is this the same transcript that you
 reviewed when you met with [the prosecutor] and I
 before trial?

 [Martin:] Uh-huh.

 [The State:] If I could direct your attention to page 25. If
 you would read that for – to yourself, please.

 -9-
 STATE V. KIMBLE

 Opinion of the Court

 [Martin:] (Complies.)

 [The State:] Thank you, ma’am. Ms. Martin, after looking
 at your transcript, and specifically page 25, do you recall
 what you told the detectives that night about what you
 actually saw?

 [Martin:] Yes.

 [The State:] And what did you tell them?

 [Martin:] I told them that I seen him shoot the gun
 and thought that he was firing and then –

 [Defense Counsel:] Objection. Speculation. What
 she thought.

 [The State:] Your Honor, it’s her own statement.

 [Defense Counsel:] Still speculation.

 THE COURT: Hang on a second. If y’all can approach.
 (Bench conference held.)

 THE COURT: Okay. For the record, that objection is
 sustained.

 [The State:] Your Honor, may I approach the witness?

 THE COURT: Yes.

 [The State:] Ms. Martin, I’m showing you page 25 of your
 transcript. Didn’t you tell the detectives I saw him holding
 a gun and I seen him running?

 [Martin:] Yes.

 [The State:] Thank you. Nothing further, Your Honor.

(Emphasis added).

 - 10 -
 STATE V. KIMBLE

 Opinion of the Court

 It is clear that defense counsel addressed the difference between Martin’s prior

statement to detectives and her testimony at trial during cross-examination.

Moreover, the State, over defense counsel’s objection, also addressed the discrepancy

between Martin’s testimony at trial and what they had discussed prior to trial. Both

Martin’s cross-examination by defense counsel and re-direct by the State occurred in

the presence of the jury.

 Then on re-cross by defense counsel, the following exchange occurred, which is

what Defendant contends constituted false testimony:

 [Defense Counsel:] When you said you shared those
 additional facts before, who did you share them with?

 [Martin:] With the DA.

 [Defense Counsel:] Okay. So you told the DA these
 additional facts?

 [Martin:] Yes.

 [Defense Counsel:] All right. When did you tell the DA
 these additional facts?

 [Martin:] Two weeks ago.

 [Defense Counsel:] When you spoke to the DA two weeks
 ago, you told the DA that you saw Mr. Kimble walk up and
 shoot Mr. Burch while he was on the ground?

 [Martin:] Yes.

 [Defense Counsel:] All right. So if you said that, then –
 well, let me rephrase. Were you aware that any new
 information that you have, the DA turns over to me?

 - 11 -
 STATE V. KIMBLE

 Opinion of the Court

 [Martin:] Yes.

 [Defense Counsel:] Okay. So as being aware of that then,
 would you be surprised to know that that new information
 was not contained in anything that the DAs gave to me?

 [Martin:] No.

 [Defense Counsel:] Okay. You wouldn’t be surprised by
 that?

 [Martin:] I wasn’t aware.

 On appeal, Defendant does not take issue with Martin’s testimony regarding

what she witnessed on the night of the murder. Rather, Defendant contends the State

refused to correct Martin’s testimony.1 Even assuming, arguendo, that Martin falsely

testified that she had informed the State of this inconsistent information prior to

trial, Defendant has still failed to show both that (1) Martin’s testimony that she had

informed prosecutors was material, and (2) the State knowingly and intentionally

used the false testimony to convict Defendant. See State v. Sanders, 327 N.C. 319,

337, 395 S.E.2d 412, 424 (1990).

 In order to be material, the misleading testimony must have “contributed to

defendant’s conviction” and that, had the witness testified truthfully, “the trial’s

result would have been no different.” Id. First, we note that the State did not rely

 1 Defendant’s appellate counsel confirmed at oral argument that the false testimony Defendant
was challenging was not that Martin witnessed Defendant shoot Burch, but rather Martin’s testimony
that she told the prosecutor she had witnessed Defendant shoot Burch.

 - 12 -
 STATE V. KIMBLE

 Opinion of the Court

exclusively on Martin’s testimony to convict Defendant. The bouncer testified to

similar facts, including witnessing the circumstances leading up to Defendant firing

the gun at Burch. The bouncer further testified that he heard a total of at least three

shots. Moreover, the five entry wounds found on Burch were determined to have

come from the same .38 caliber firearm.

 More importantly, on appeal, Defendant does not take issue with what Martin

saw. Instead, Defendant takes issue with when and whether Martin informed the

State of what she had witnessed. This inconsistency goes only to Martin’s credibility

as a witness. The inconsistency is not material because the jury still had the

opportunity to consider Martin’s testimony in light of Defendant’s cross-examination

and the State’s redirect, and also observe her demeanor and consider her credibility

as she testified. See Phillips, 365 N.C. at 126, 711 S.E.2d at 140 (noting that the

witness’s testimony, although inconsistent with the notes taken by others during her

pretrial interviews, was not entirely false and “any inconsistency was addressed in

the presence of the jury”). Therefore, there is no reasonable likelihood the testimony

concerning when and whether the information was provided to prosecutors by Martin

affected the judgment of the jurors in light of the other evidence at trial. The jury

was aware that Martin’s recollection of what she previously told law enforcement

about the events she witnessed differed from what law enforcement and prosecutors

recorded. Thus, “[t]he jury heard conflicting evidence,” Sanders, 327 N.C. at 337, 395

 - 13 -
 STATE V. KIMBLE

 Opinion of the Court

S.E.2d at 424, and “any inconsistency was addressed in the presence of the jury by

[Martin]’s subsequent cross-examination.” Phillips, 365 N.C. at 126, 711 S.E.2d at

140.

 Furthermore, Defendant has presented no supporting evidence for his

assertion that the State “knowingly or intentionally” allowed Martin to testify falsely.

“There is a difference between the knowing presentation of false testimony and

knowing that testimony conflicts in some manner. It is for the jury to decide issues

of fact when conflicting information is elicited by either party.” State v. Allen, 360

N.C. 297, 305, 626 S.E.2d 271, 279 (2006) (brackets omitted). “Inconsistencies and

contradictions in the State’s evidence are a matter for the jury to consider and

resolve,” and “there is no prohibition against a prosecutor placing inconsistencies

before a jury.” State v. Edwards, 89 N.C. App. 529, 531, 366 S.E.2d 520, 522 (1988).

 The record reflects that the State did not know Martin would provide

inconsistent testimony. Outside the presence of the jury, the State informed the trial

court that Martin had not informed them of this information and the pre-trial notes

provided to defense counsel reflect this. Also, when the trial court classified Martin’s

testimony as “a discrepancy between what the witness believes she told the State and

what the State has recorded in their notes,” and not a violation of statutory discovery

rules, defense counsel responded in the affirmative. Moreover, during defense

counsel’s cross-examination of Martin, counsel was able to elicit testimony that the

 - 14 -
 STATE V. KIMBLE

 Opinion of the Court

State was not in fact aware of the inconsistent testimony and that the State’s notes

to defense counsel were not consistent with Martin’s testimony. The jury heard this

conflicting testimony and when defense counsel was provided the opportunity to re-

cross Martin, counsel declined to do so.

 Conclusion

 Martin’s inconsistent testimony was neither material nor was it knowingly and

intentionally used by the State to obtain Defendant’s conviction. Defendant’s due

process rights were not violated. Accordingly, we find no error.

 NO ERROR.

 Chief Judge McGEE and Judge COLLINS concur.

 - 15 -